SORGEN v. PRENDERGAST, Comptroller, et al.

(Supreme Court, Special Term, New York County. June 22, 1910.)

MUNICIPAL CORPORATIONS (§ 662*)—"MARKET"—REGULATION.

A space under the approach of a bridge, occupied by fish peddlers pursuant to the permission of the commissioner of bridges, in consideration of payments made by them to the city of New York, is a "market," though not formally so declared, as authorized by Greater New York Charter (Laws 1901, c. 466) § 47, and it is under the control of the comptroller and his department, as authorized by section 151, and not under the management of the bridge commissioner, under sections 595 and 596.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1433; Dec. Dig. § 662.*

For other definitions, see Words and Phrases, vol. 5, pp. 4380–4381.]

Action by Henry Sorgen, for and on behalf of himself and all other licensed peddlers similarly situated, against William A. Prendergast,

as Comptroller of the City of New York, and others.   Motion for an injunction pendente lite denied.

Saul S. Myers (Selden Bacon, of counsel), for plaintiff.

Archibald R. Watson, Corp. Counsel (Dudley Field Malone, of counsel), for defendants.

GIEGERICH, J.   The plaintiff, on behalf of himself and other licensed peddlers occupying stalls in the space between Pitt and Willett streets, in the borough of Manhattan, under the Manhattan approach of the Williamsburgh Bridge, seeks to restrain the defendants from interfering with the plaintiff and other similarly licensed peddlers in their occupancy and the possession of such stalls.   The theory on which the defendant Prendergast, as comptroller, and the other defendants have interposed in the matter seems to be that the space in question constitutes a market, and as such comes within the jurisdiction of the defendants under the provisions of the city charter.

That the space in question is in reality a market, although not formally so declared, is well established by the moving papers.   It appears therefrom that at the place in question, since September 1, 1904, about 100 fish peddlers, including the plaintiff, have been permitted to maintain stalls or stands in places allotted to them severally by the commissioner of bridges, in consideration of payments made by them to the city, and that the plaintiff and other licensed peddlers have since that date kept wooden pushcarts at the places allotted to them, and have sold fish therefrom on each day of the week, except during certain hours on Saturday and Sunday, and that a large business has grown up, to the great benefit and advantage of the large surrounding population, securing them fresh and wholesome fish food.   It further appears from the moving papers that on Friday, May 13, 1910, the defendant removed the plaintiff from his regular stand and gave that place to another, and made similar changes of location in the case of other tenants.   It is further stated that the stands are of varying degrees of value, and that the plaintiff had formerly been in possession of one of the best, but received on the new allotment an inferior stand at a great distance from the street front, thereby destroying in a large measure the good will and business he had established.   On this point in his opposing affidavit the comptroller states that his purpose in making the changes he did was to distribute the positions of advantage among all the fish peddlers by lot, regularly and frequently, so that all might have equal opportunity of holding such advantageous positions in succession for a short period of time.   It further appears that the board of aldermen has never taken any action establishing the place in question as a market, which it has the power to do under section 47 of the charter (Laws 1901, c. 466).   Section 151 of the charter further provides the manner in which the comptroller and his department and officials therein shall have control of such markets.

On behalf of the plaintiff it is contended that the space in question is under the management of the bridge commissioner under the provisions of title 9 of the charter, especially section 595, subd. 4, thereof. Attention is also called to the provisions of section 596, which requires the commissioner of bridges to keep accurate accounts of all moneys

received or collected by his department "for fares, tolls and any other purpose," in such form as the comptroller or the ordinances of the board of aldermen shall require, and that he shall pay over the same daily to the chamberlain and make a daily report of the same to the comptroller; especial emphasis being placed upon the use of the words "any other purpose," as indicating that the statute contemplates that the commissioner of bridges shall receive income other than from fares and tolls. Attention is also called to the fact that by section 1 of chapter 421 of the Laws of 1897 the commissioners of the Williamsburgh Bridge were expressly authorized to lease "any of the real estate purchased or taken by them for the use of the bridge   *   *   * not required to be left open and unimproved as a street or as an approach to the bridge." It is argued on behalf of the plaintiff that the case is similar to New York Mail & Newspaper Transportation Co. v. Shea, 30 App. Div. 266, 51 N. Y. Supp. 563, in which, with respect to the Brooklyn Bridge, it was held that any uses of the bridge property not inconsistent with its proper use and maintenance as a bridge were permissible; such uses, for example, as the maintenance of warehouses under the arches supporting the approaches to the bridge, stringing telephone and telegraph wires, and the point more particularly under consideration in the case, the maintenance and operation of tubes for the transmission of mails, newspapers, and parcels.

Conceding, for the purposes of the argument, that the principle of that case applies to the use of the open spaces underneath the approach to the Williamsburgh Bridge, I am of the opinion, nevertheless, that since the Legislature has in the charter which it has given to the city provided that markets shall be under the control of the comptroller and other officers in the finance department, this legislative policy should not be defeated or evaded by the action of the bridge commissioner in establishing the place in question as a market in fact and the failure of the board of aldermen to declare it to be such. Upon this point the action of the board of aldermen in July, 1902, is significant. At that time, by ordinance, it declared the space between Attorney street and Ridge street, which is in the line of the bridge approach and a few blocks to the west of the block now in question, to be "a temporary market for hucksters and peddlers using pushcarts, pending the completion of the bridge." Furthermore, it recognized in express terms the jurisdiction of the comptroller over such temporary market. When the bridge was opened for use, the area so occupied by the temporary market had to be used as a part of the roadway giving access to the structure, and the hucksters and peddlers were then allowed to move to the present location, which, as before said, is a few blocks further east and is underneath the approach, which at that point is considerably elevated above the surface. If the temporary market was properly placed under the authority of the comptroller, then all the more ought the present market, which seems to have all the elements of permanency, to be under his authority.

The motion for an injunction must therefore be denied, with $10 costs.